Before we begin, I'd like to note that I'm told by the courtroom deputy that this is Mr. Leif Johnson's last oral argument, is that right? This makes it the 54th oral argument that you've provided us, so we thank you for your many years of service. All right, you may begin. Good morning, Your Honors. May it please the Court and Counsel. My name is Megan Moore, and I represent the appellant in this case, Eric Bruce Fowler. It is not my 54th oral argument, it is my second. The questions before the Court today are whether a cross-deputization agreement between the Montana Highway Patrol and the Fort Peck and Assiniboine Tribe of the state of Montana is valid by its own terms and also under applicable federal law. The second question is if so, or even if not, whether the failure of the officer in this particular case to possess and carry an ID card as required by the agreement under which he was purportedly deputized renders his search of Mr. Fowler unlawful. I would like to reserve two minutes for rebuttal, and I'll try to be mindful of my time as well. Thank you. The answer to both of these questions that I've just presented is yes. These cross-deputization agreements are invalid by both their own terms and by federal law, and the failure of the officer in this instance to carry an ID card is... The remedy should be suppression of the evidence gathered as a result of his search. Briefly, the facts in this case, Trooper David Moon is a Montana Highway Patrol trooper. He's employed by the state of Montana. He observed Mr. Fowler driving without a license plate down Highway 2, which is the Montana State Highway, but it runs through the boundaries of the Fort Peck Indian Reservation, and this interaction took place completely within the bounds of the reservation. Trooper Moon initiated a traffic stop on Mr. Fowler because he saw Mr. Fowler driving without a license plate. Can I ask you, just abstracting a bit from the facts of this case, so the tribe has sovereign authority to enforce its own law, right? Correct. And it can have tribal members and make them police officers, and then they enforce the law, or it could have somebody else do it, right? And so what is the federal limitation on the tribe's authority to have a state officer or the Pinkerton Detective Agency or whoever else they want to hire to enforce their law? What limits the tribe's authority to do that? Well, there are a couple of things, Your Honor. First, 18 United States 1152 gives the federal government exclusive jurisdiction over Indian country, absent exceptions, and some of those exceptions are things like public laws, appeal 280 for one, which gives some states authority to enforce law on Indian reservations over Indian persons. Montana is not one of those states, so that does not apply here. Secondly, in this particular case, the agreements themselves are the ones that insert federal authority into this equation because they contemplate several, they invoke federal law in several places. I'm sorry. Go ahead. Well, just before you get to that, I mean, I understand you have an argument about these agreements, but suppose we had an agreement that doesn't say that. It's just, you know, the tribe just says, doesn't say anything about federal law, just says, you know, we're authorizing state officials to enforce, you know, not to enforce state law, but to enforce our tribal law on the reservation. What is the federal limit on the tribe's authority to do that if it wants to? Your Honor, I don't believe there's a federal limit other than, you know, the jurisdictional issue that the federal government is the only United States entity or entity other than the tribe itself that can enforce criminal jurisdiction. So when you say it's only the tribe itself, that goes to Judge Miller's question. Could the tribe hire people who are not Indians or not members of the tribe to enforce tribal law, or is there a federal law that says they couldn't do that? Your Honor, I'm not aware of a federal law that says that they couldn't do that. But again, that's not what happened in this case. Well, didn't they authorize non-tribal members to enforce tribal law? That was my understanding of exactly what happened here. The cross-deputization agreements do—that's the intent of the agreements. That's the purpose, to deputize state law enforcement officers like the Montana Highway Patrol and county law enforcement officers to enforce tribal law on behalf of the tribe. And so there's no federal law that says they can't do that because state law enforcement are just like anyone else. They can be hired by the tribe to enforce tribal law. That's correct, Your Honor. There's no federal prohibition. But if we look at the terms of these agreements, they contain the federal laws that are then— So you're saying there's something in the agreement that says that the tribe couldn't, in this instance, hire state law enforcement officials to enforce tribal law. No, there's nothing in the agreement that says that the state can't do that. But what the agreements do say are that these state law enforcement officers or other law enforcement officers who are hired by the tribe to enforce tribal law are bound. Their minimum commissioning standards are set by the law enforcement handbook for the U.S. Department of the Interior. And then we have the U.S. Department of the Interior, at a later date after reviewing these, say, hang on, these state law enforcement officers do not meet those minimum commissioning conditions. And so my argument isn't necessarily that an agreement like this would be preempted or would be invalid under federal law if that provision wasn't included. So just to understand your argument, you're saying that the agreement or the contract between the state and those state law enforcement officials say that the state law enforcement officials have to meet certain standards and these state law enforcement officials did not meet those standards. Is that what you're saying? So that there was, like, a breach of contract or some error of contracting? I am, Your Honor. And it is interesting because it does get into the principles of contract law. And that's exactly what happened. So if you look at the cross-deputization agreements, there are two agreements, an initial agreement that was executed in 2000 and that was executed by all parties and by all parties. So if the tribe goes forward, this is also getting back to contract law and apparently doesn't care about this breach of contract. I mean, normally we say we give force to the contract because the parties show by their actions that they don't deem it to be a breach or the breach is immaterial, which is what the tribe did here. Am I right on that? Your Honor, I think that that's debatable. The tribe did ratify these agreements and the tribe did do that by a resolution with the knowledge that it failed to obtain the signature of one of the parties, the Bureau of Indian Affairs representative. So under the contract, then, these state officials were hired, properly hired by the tribe to enforce tribal law. Well, I think that regardless of what the parties want to do, you can't have a contract where one of the parties that they chose to make crucial to this agreement, they chose to make that party, to make the agreement conditioned upon that party's approval. Did you say they ratified it in any event? They did, but that ignores the plain language of the agreement. What about the 2000 agreement? Because there's an agreement in 2000 that everybody signs, right? And then the 2003 agreement is a modification of that, adding Valley County. I guess Moon wasn't a Valley County officer, so that's not relevant. Correct. So if we think that the 2003 modification was void because BIA didn't sign it, doesn't that just leave the 2000 agreement in effect? Well, the 2000 and the 2003 agreements are the same in substance aside from the inclusion of Valley County. And so what happened, if you actually look at the documents which are included in the record, the 2003 agreement, there was an amendment added, and then the agreement was, it looks like it was retyped. It's the same pretty much word for word aside from the inclusion of Valley County, but they did go to the trouble of retyping it. The spacing on the pages is a little bit different, and then they updated the names of each person who was the representative of the parties. And so I see that as a new agreement, new parties involved, even though they're updated representatives. But still, I think the 2003 amendment and the agreement should be seen as a new agreement that supersedes the 2000 agreement. But it can't, I mean, if it wasn't effective as a new agreement because not everybody signed it, like normally if parties have a contract and then they try to negotiate a new contract but fail to do so, that doesn't by itself void the earlier contract that they still have, does it? It doesn't, and that's fair, Your Honor. What does, though, is the 2016 letter from the Bureau of Indian Affairs from Douglas Noseep, who was the special agent in charge at that time, and this letter is also included in the excerpts of record. This letter states that he reviewed both agreements, and he determined that neither met the requirements that these law enforcement officers meet these minimum commissioning standards, that they be treated as federal employees. And there has been a lot of confusion about that letter because that letter references the special law enforcement commissions, which is the federal mechanism for the federal government. In trying to figure this out, where the letter says the Montana state officials are not federal employees, it doesn't seem to affect the fact that the tribe hired these state officials to enforce tribal law, particularly since, as you state, they ratified the agreement regardless. So I'm not sure why that letter makes any difference to where we currently are. Well, the letter makes a difference because it confirms that certain key portions of this agreement cannot be executed as written, cannot be executed as intended, and so the agreement cannot function as a whole as intended. The tribe could have written this agreement without making commissions dependent upon BIA approval and dependent upon this federal law enforcement handbook, but they chose to do that within the agreement. And so if there are no standard minimum commissions, then, I mean, at first I would argue that the agreement should be invalid if there are no standard minimum requirements for commissioning law enforcement officers who are not tribal members to enact tribal law upon tribal members. Is there a law that requires that, or are you saying it's a matter of policy? I'm saying it's a matter of policy. And, Your Honor, this issue has not come up much, frankly, and so a lot of these arguments are based in policy. Can I ask you a question, Ms. Judge Preckerson? So this is obviously an important issue affecting the tribe's ability to manage its law enforcement affairs. Has the tribe taken a position on whether you're correct or not? Your Honor, I don't have an official position from the tribe. However, I did receive communication, and that has been in the record, from a woman named Mary Cleland. She's a tribal lay advocate, and so she's not an attorney. She's not in a position to have standing in this court. She's not in a position to file an amicus brief or anything like that. However, she has been working her entire life as a tribal. They call them lay advocates. They're trained in certain principles of law. They're trained in tribal law, and she sent a letter, which was filed with this court, that said that she and the people that she represents in her role do not support these agreements. They do not agree to be subject to these agreements. They do not recall any special election or being part or being given an opportunity to be part of any resolution approving these agreements. They didn't have a vote. Does she speak for the tribe, does she? I'm sorry? Does she speak for the tribe? Not in an official capacity, Your Honor. And I don't have a response in an official capacity from the tribe. And it seems to me that if we were to adopt your logic, we would have to go back and look at all of the dozens and dozens and maybe more convictions and suppressions and searches that have taken place over the last many, many years and decide that those officers acted without legal authority, right? That's true, Your Honor. It would be very impactful. I would estimate that dozens is probably a very low number of the people, tribal members who have been subject to prosecutions as a result of these agreements. Did you want to save the rest of your time?  Thank you, Your Honor. All right. Good morning, Your Honors. May it please the Court. My name is Leif Johnson for the United States. I would like to briefly touch on the authority issue, and then I'll turn to the CDA provisions if that pleases the Court. But, of course, I'm at your disposal. As to tribal authority in this case, we submitted a 28-J letter recounting some of the authority that the tribe has under the Indian Reorganization Act to promulgate a constitution. A copy of that was attached to our letter. The constitution itself is ratified by the tribe and approved by the federal government in 1960, and it contains a provision, Section 7, that outlines the inherent self-governance powers that this tribe retains and intends to exercise on its own behalf within this reservation. And those powers include the power to negotiate contracts and agreements with state and local governments on the tribe's behalf. That's at 7 sub 1. And then 7 sub, I believe it is, 8, also outlines the tribe's intent to create a criminal code, a civil code, a court system, and a police system. And, of course, in this case, the tribe has done that. It has exercised those powers, allowed by Congress under the Indian Reorganization Act, to go ahead and hire a police department and create a justice system. Our position here is that Trooper Moon is simply a member of that tribal police force by action of the contract and the commission that was issued under that contract. And so if a state wants to have a compact with another state, right, under the Compacts Clause, that requires congressional approval, but there's no equivalent rule for a state having a compact with a tribe? I believe there's a state law that authorizes the state to compact with tribes over these issues. And as I mentioned, the Indian Reorganization Act specifically included language that was incorporated in this Constitution that the tribe is free to contract with the state on its own behalf. So that power is a general power of internal self-governance. It's not an external power that's limited by court decision or other federal statute, like criminal prosecution of non-Indians or treating with a foreign nation. Those are the types of external powers that are limited. But this sort of internal power exists as an inherent power of tribal self-governance that's been expressed in its Constitution. Okay. Having said that, moving to the... May I ask a quick question before? Yes. So it would also seem to me that if the prior counsel's argument was, to some extent, an issue of contract interpretation, just by conduct alone, these deputization agreements seem to have been used for quite some time prior to a particular incident. And if you're looking for the validity of the contract, it would seem to me that just the course of conduct of the parties would indicate that the tribe believed that it should be interpreted in a way that makes it valid. We agree, Your Honor. And I want to clarify for the court just our position on this whole sort of tribal contract and how that affects the officer's authority here. I mean, clearly we have some issues with regard to this contract between the tribe and the state, and there's some provisions that obviously are inoperable. But the fact of the matter is the tribe, by operation of its own law, issued a resolution, which is a tribal legal act that gave a commission to this officer. And so the tribe did that in 2014 and later renewed it in 2016. And those resolutions are in the record at SER pages 7 through 9. And those resolutions are the organic act, the legal act of the tribe that conferred the power on Trooper Moon. So despite any sort of dispute that the state and the tribe might have over whether an officer is covered under the FTCA, that's a contractual dispute between those two governmental entities. But the power has been conferred to Trooper Moon through that commission, and that power exists regardless of what happens on the contract unless the parties decide to dissolve the entire thing, in which case Trooper Moon would have to be decommissioned by some act of law by the tribe. So right now, as things stand, he is a tribal law enforcement officer. And we know from the Indian Organization Act and many cases of this court that the tribe has that inherent power to, I guess I'm louder than I think, to hire and commission officers to enforce its own laws against its own members. So I guess I would ask the court to look to the commissions themselves as the organic basis for giving the officer power to essentially do what he did here. And then I'd like to turn briefly to the issue of the tribal officer ID. This is another contract requirement. Obviously, the record reflects that the CDA requires that the commissioned officer carry a tribal identification with him during the course of a suspect detention. In this case, he didn't have one. He wasn't issued one. Apparently the tribe didn't issue him one. And again, we think that that is not a material issue with regard to the Fourth Amendment for two reasons. Number one, as I've already expressed, the tribal commission is unaffected by this failure to adhere to one of the criteria in the cross-deputization agreement. But perhaps more importantly, I would call the court's attention to this court's decision in Becerra-Garcia where Judge McKeown essentially rejected the same argument. In that case, the Tohono O'odham tribe had hired a couple of tribal rangers and they were sort of quasi-law enforcement. And they were not empowered by the tribe to actually make searches and seizures. But when they did in one case, the defendant there argued, as my friend Ms. Moore does here, that that failure to comply with a tribal requirement, a policy requirement of tribal law, was somehow a fatal overlay on the Fourth Amendment analysis. And as Judge McKeown described in some detail, that's not how it works. The Fourth Amendment analysis is governed by federal law and it's governed by the usual standards that are applied in Fourth Amendment cases. So any issue with regard to the ID might give rise, as Judge Moore said in his underlying order, might give rise to a grievance between the tribe and the state as to whether Trooper Moon should remain a commissioned officer. It didn't affect the Fourth Amendment analysis in this case. And so I guess I would like to finish by saying, as Judge Pregerson mentioned, and as you can be aware from some of your own decisions, and particularly the Becerra-Garcia but also the Los Coyotes case, these are important agreements in Indian country. This agreement's been in place for 20 years. There's probably a reason that Mr. Fowler didn't ask to see the officer's ID because it's a small community. It's likely that most people know that MHP officers are enforcing tribal law on the highway within their reservation, and it's an important aspect that gives additional force to the tribe's ability to enforce its own laws against its own members. So if the court has no further questions, I will cede the remainder of my time. Apparently not. Thank you. Thank you. But thank you for your final argument. As is. Thank you. It was an excellent final argument as well. Thank you. Thank you, Your Honors. It's true that the tribe has the ability to create and enforce its own laws. However, tribal members also have the right to know what laws they're subject to, and we keep talking here about disputes between the governments, disputes between the states, disputes between these parties to this contract. But what I think we're overlooking is the effect on the actual citizens who are subject to these agreements. And when you've got somebody like Mr. Fowler, who has an advocate who's reading these agreements to him and saying that this person needs to have this, they need to have this, did they do this, and they didn't. Those things did not happen. This ID card, Mr. Johnson would like to write that off as a technicality. But at the suppression hearing, it was revealed that Trooper Moon didn't know he was even supposed to have an ID card. He had never been issued one. His sergeant didn't know he was supposed to have one. He had never even read this agreement. He testified to that on the record. And I think that it is not a technicality. It is obvious from that revelation that it is a systemic disregard for these laws. And so if the tribe does want to enforce its own laws, and there is a law enforcement crisis on the reservation, there's no doubt about that. But if the tribe wants to make these agreements, it is required to be fair to its constituents and have clear agreements that are lawful. Thank you. I thank both parties for their arguments. The case of United States v. Eric Bruce Fowler is submitted, and we're adjourned for this session.
judges: IKUTA, MILLER, Pregerson